## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 21-CV-1776

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

                              Plaintiff,

        v.

SKIHAWK CAPITAL PARTNERS, LLC,
THE CONVERGENCE GROUP, LLC,
CLEMENT M. BORKOWSKI,
SEAN A. HAWKINS, AND
JOSEPH P. SCHIFF,

                              Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff United States Securities and Exchange Commission (the "SEC") alleges as follows against Defendants SkiHawk Capital Partners, LLC ("SkiHawk"), The Convergence Group, LLC ("TCG"), Clement M. Borkowski ("Borkowski"), Sean A. Hawkins ("Hawkins"), and Joseph P. Schiff ("Schiff") (collectively "Defendants"):

### <u>SUMMARY</u>

1.     This case involves fraud, material misrepresentations, and breaches of fiduciary duty by a Colorado-registered investment adviser, SkiHawk, and an unregistered investment adviser, TCG, along with the owners and managers of those advisers, Borkowski, Hawkins, and Schiff. For years, the Defendants have repeatedly defrauded three private funds they advise and the investors in those funds.

2.      First, from 2016 to present, while acting as the investment adviser to the private fund ASI Healthcare Capital Partners I, L.P. (the "Healthcare Fund"), SkiHawk, Borkowski, and Hawkins caused (1) the Healthcare Fund to invest in companies that Borkowski and Hawkins controlled and had an interest in, (2) the Healthcare Fund to pay a company that Borkowski and Hawkins partially owned to provide services to the fund, and (3) the companies in which the Healthcare Fund invested to enter into agreements for services with entities owned and managed by Borkowski and Hawkins, paying those entities millions of dollars. Each of these actions created a material conflict of interest between, on the one hand, SkiHawk, Borkowski, and Hawkins, and, on the other hand, the fund they advised and owed a fiduciary duty. SkiHawk, Borkowski, and Hawkins, however, failed to disclose these specific conflicts. These conflicted transactions resulted in millions of dollars of additional compensation for Borkowski and Hawkins.

3.      To address and evaluate conflicts of interest, the Defendants represented in Healthcare Fund private placement memoranda ("PPMs") that a Healthcare Fund Advisory Board would review fund investments for potential conflicts of interest. In fact, the Advisory Board never reviewed the conflicted transactions, and by 2019 the Advisory Board was no longer functioning.

4.      Second, from 2016 to 2020, SkiHawk, TCG, Borkowski, and Hawkins made false and misleading statements to investors in another private fund they managed, the ASI Capital Income Fund, LLC (the "Income Fund"). SkiHawk, TCG, Borkowski, and Hawkins falsely represented that investors' investments were secured by UCC-1 financing statements when, in fact, they were not.

5.     Third, Defendants, while serving as investment advisers to the Income Fund and another private fund, ASI Capital, LLC ("ASI Capital"), breached the fiduciary duty owed to those funds and made false and misleading statements to investors and prospective investors by overvaluing two assets held by those funds by millions of dollars, making it appear that the funds were performing better than they were and allowing them to charge higher fees.

6.     As a result of the conduct described herein, defendant SkiHawk violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

7.     As a result of the conduct described herein, defendant TCG violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, Sections 206(2) and 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder.

8.     As a result of the conduct described herein, defendants Borkowski and Hawkins violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, Sections 206(1), 206(2) and 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder. In the alternative, defendants Borkowski and Hawkins aided and abetted SkiHawk's violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, and TCG's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

9.      As a result of the conduct described herein, defendant Schiff violated, and unless restrained and enjoined, will continue to violate Sections 17(a)(1) and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act, Rules 10b-5(a) and (c) thereunder, Sections 206(2) and 206(4), and Rule 206(4)-8 of the Advisers Act. Schiff also aided and abetted SkiHawk's violations of Section 10(b) of the Exchange Act, Rule 10b-5(b) thereunder, Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

10.     The SEC seeks permanent injunctions against each of the Defendants, enjoining them from future violations of the securities laws, disgorgement of all Defendants' ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, and civil penalties against Defendants under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], and such other relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14].

12.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14 and 28 U.S.C. § 1391(b)]. Defendants Borkowski, Hawkins, and Schiff resided and conducted business in the District of Colorado during at least part of the fraud. SkiHawk and TCG conducted business in the District during at least part of the fraud and SkiHawk is located in the District. Many investors are located in the District and many of the

acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District.

13.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments or transportation or communication in interstate commerce.

14.     The Defendants entered into tolling agreements to toll the running of any statute of limitations against them from December 20, 2019 to June 20, 2020, from August 31, 2020 to December 31, 2020, and from December 31, 2020 to June 30, 2021.

## DEFENDANTS AND OTHER RELEVANT ENTITIES

15.     Below is a graphical representation of the relationship between the Defendants and other relevant entities:



I. **Defendants**

16.     **SkiHawk Capital Partners, LLC ("SkiHawk")**, a Colorado limited liability company with its principal place of business in Colorado Springs, Colorado, has been registered as an investment adviser with the State of Colorado since 2011. SkiHawk is 100% owned, either directly or indirectly, by Hawkins and Borkowski. SkiHawk acted as investment adviser to: (1) ASI Capital from at least 2012 to 2018, (2) the Income Fund from at least 2015 to at least 2018, and (3) the Healthcare Fund from 2016 to present.

17.     **The Convergence Group, LLC ("TCG")**, is a Puerto Rico limited liability company with its principal place of business in Humacao, Puerto Rico. It is not registered as an investment adviser. TCG acted as an investment adviser to ASI Capital and the Income Fund since its formation on January 1, 2019 to present. TCG is owned, either directly or indirectly, by Borkowski, Hawkins, and Schiff.

18.     **Clement Borkowski ("Borkowski")**, age 48, is a resident of Colorado Springs, Colorado and of Humacao, Puerto Rico. Borkowski has been a manager and 50% beneficial owner, either directly or indirectly, of SkiHawk from 2011 to the present, and a manager and 37.5% beneficial owner, either directly or indirectly, of TCG from 2019 to the present. Borkowski has also been an owner of ASI Capital and the Income Fund from 2012 to 2018, an owner of the general partner for the Healthcare Fund from 2016 to the present, and an owner, either directly or indirectly, of the general partner and/or manager of several of the portfolio companies in which the Healthcare Fund invested.

19.     **Sean Hawkins ("Hawkins")**, age 46, is a resident of Colorado Springs, Colorado. Hawkins has been a manager and 50% beneficial owner, either directly or indirectly, of SkiHawk from 2011 to the present, and a manager and 37.5% beneficial owner, either directly or indirectly, of TCG from 2019 to the present. Hawkins has also been an owner of ASI Capital

and the Income Fund from 2012 to 2018, an owner of the general partner for the Healthcare Fund from 2016 to the present, and an owner, either directly or indirectly, of the general partner and/or manager of several of the portfolio companies in which the Healthcare Fund invested.

20.     **Joseph Schiff ("Schiff")**, age 60, is a resident of Monument, Colorado. Schiff was a licensed certified public accountant ("CPA") in Colorado during the relevant time period and remains a licensed CPA. Schiff has been a 25% beneficial owner, either directly or indirectly, of TCG since its formation in January 2019 to the present, the president of TCG from January 2019 to the present, and the chief financial officer ("CFO") of TCG from 2019 through early 2021. Schiff formerly served as the CFO of ASI Capital from 2014 to 2018.

## II.  Other Relevant Entities

21.     **ASI Healthcare Capital Partners I, L.P. (the "Healthcare Fund")**, is a Delaware limited partnership based in Colorado Springs, Colorado formed in February 2016 for the purpose of investing in health care facilities. At all times, the Healthcare Fund was managed by SkiHawk. The Healthcare Fund offered and sold securities through at least the beginning of 2020. The general partner of the Healthcare Fund is ASI Healthcare Capital Partners GP, LLC, which is owned, either directly or indirectly, in part by Hawkins, Borkowski, and Schiff. The Healthcare Fund has at least 80 investors and has raised at least $30 million from investors.

22.     **ASI Capital, LLC ("ASI Capital")**, is a Wyoming limited liability company based in Colorado Springs, Colorado. It makes equity and debt investments in various companies. ASI Capital offered and sold securities in the form of note investments to investors from 2012 to 2015, did a rescission offering in 2017, and offered and sold securities in the form of limited liability company ("LLC") membership interests from 2019 through early 2020. From formation through December 31, 2018, ASI Capital was owned in part, either directly or indirectly, by Borkowski and Hawkins. Schiff was the contract CFO for ASI Capital from 2014

through 2018. In late 2018, ASI Capital amended its operating agreement to conduct a private placement offering. The amendment also provided that TCG would become the manager of ASI Capital. ASI Capital declared bankruptcy in June 2020, obtained forbearance agreements from investors in early 2021, and voluntarily dismissed the bankruptcy in April 2021. ASI Capital has at least 80 investors and raised at least $13 million from investors. Its total assets as of December 31, 2020 were approximately $36 million. This amount includes all of the assets of the Income Fund ($32 million as of December 31, 2020) because ASI Capital owns 100% of the Income Fund.

23.     **ASI Capital Income Fund, LLC (the "Income Fund")**, is a Wyoming limited liability company based in Colorado Springs, Colorado. It made bond offerings to individual investors from 2015 to 2020, and used investors' money to make equity and debt investments in various companies. The Income Fund is 100% owned by ASI Capital and all assets of the Income Fund are reflected on ASI Capital's consolidated statement of assets and liabilities. SkiHawk managed the Income Fund through its advisory contract with ASI Capital from 2015 through 2018, and, since January 2019, TCG has managed the Income Fund through a similar contract. The Income Fund has at least 100 investors and raised at least $32 million from investors. The Income Fund declared bankruptcy in June 2020, obtained forbearance agreements from investors in early 2021, and voluntarily dismissed the bankruptcy in April 2021.

## FACTS

**I.  The Defendants Were Investment Advisers and Owed a Fiduciary Duty to Their Clients.**

### *A. SkiHawk Acted as an Investment Adviser to the Healthcare Fund, ASI Capital, and the Income Fund Within the Meaning of Section 202(a)(11) of the Advisers Act.*

i.  Healthcare Fund

24.     From at least 2016 through the present, SkiHawk has been the investment adviser to the Healthcare Fund.

25.     SkiHawk, for compensation, engaged in the business of advising the Healthcare Fund as to the value of securities and as to the advisability of investing in, purchasing, or selling securities and made investment decisions on behalf of the fund.

26.     A Form ADV is designed to provide adequate disclosure to advisory clients so that they can understand the firm they are hiring to manage their investments and what economic incentives in the firm's business model might influence the firm's decision-making on the client's behalf. It also provides a basis for the client to compare a particular firm's fees, compensation, and other business practices with other firms that the client might be considering.

27.     SkiHawk's Forms ADV during the relevant period state that SkiHawk is an investment adviser to the Healthcare Fund.

28.     The Healthcare Fund pays SkiHawk a 1% management fee and pays a 20% performance fee to the fund's general partner.

29.     As an investment adviser, SkiHawk owed a fiduciary duty to the Healthcare Fund.

ii.  ASI Capital

30.     From at least 2013 to 2019, SkiHawk was the investment adviser to ASI Capital.

31.     SkiHawk, for compensation, engaged in the business of advising ASI Capital as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

32.     According to ASI Capital's 2013 PPM, SkiHawk provided investment advisory and management services to ASI Capital in exchange for an annual fee of 2% of the value of the assets it managed.

33.     In January 2015, ASI Capital entered into an "Advisory Consulting Agreement" with SkiHawk, which changed the 2% management fee paid to SkiHawk to a flat $280,000 payment per year.

34.     SkiHawk's Forms ADV throughout the relevant period stated that SkiHawk managed the operations of ASI Capital until 2019 when, as detailed below, TCG became the investment adviser to ASI Capital.

35.     As an investment adviser, SkiHawk owed a fiduciary duty to ASI Capital.

iii.  Income Fund

36.     The Income Fund was managed by SkiHawk and ASI Capital. From at least 2015 to 2019, SkiHawk acted as an investment adviser to the Income Fund.

37.     SkiHawk, for compensation, engaged in the business of advising the Income Fund as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

38.     The Income Fund signed a management services agreement with ASI Capital, which became effective in 2015, whereby ASI Capital agreed to handle all the day-to-day aspects of the Income Fund's management in exchange for a monthly fee of 2% of the total bonds issued by the Income Fund.

39.     From 2015 to 2019, SkiHawk was the investment adviser to ASI Capital and, because the Income Fund was 100% owned by ASI Capital, to the Income Fund, as well.

40.     SkiHawk's 2016 Form ADV stated that SkiHawk acted as the investment manager for ASI Capital, and SkiHawk's 2017 and 2018 Forms ADV stated that SkiHawk acted as the investment manager for ASI Capital and the Income Fund.

41.     One of SkiHawk's responsibilities in managing the Income Fund was managing investments, including valuations.

42.     As an investment adviser, SkiHawk owed a fiduciary duty to the Income Fund.

**B.  _TCG Acted as an Investment Adviser to ASI Capital and the Income Fund Within the Meaning of Section 202(a)(11) of the Advisers Act._**

43.     On January 1, 2019, Borkowski, Hawkins, and Schiff formed TCG, and TCG began acting as an investment adviser to ASI Capital and the Income Fund.

44.     TCG, for compensation, engaged in the business of advising ASI Capital and the Income Fund as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

45.     Starting on January 1, 2019, TCG was paid a 2% management fee and 20% performance fee by ASI Capital.

46.     TCG handled all aspects of managing ASI Capital and the Income Fund, including performing valuations of investments.

47.     As an investment adviser, TCG owed a fiduciary duty to ASI Capital and the Income Fund.

48.     In the alternative, if TCG was not acting as an investment adviser to ASI Capital and the Income Fund from January 1, 2019 to the present, then SkiHawk was acting as the investment adviser to ASI Capital and the Income Fund during that period.

C. ***Borkowski and Hawkins Acted as Investment Advisers to the Healthcare Fund, ASI Capital, and the Income Fund Within the Meaning of Section 202(a)(11) of the Advisers Act.***

49. Borkowski and Hawkins were investment advisers to the Healthcare Fund, ASI Capital, and the Income Fund.

50. Borkowski and Hawkins, for compensation, engaged in the business of advising the Healthcare Fund, ASI Capital, and the Income Fund as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

51. Borkowski received compensation for the period from 2012 through the present for his advisory work through payments received from SkiHawk and TCG.

52. Hawkins received compensation for the period from 2012 to the present for his advisory work through payments received from SkiHawk and TCG.

53. Borkowski and Hawkins own and control SkiHawk, and are owners of and exert control over TCG. Borkowski and Hawkins had control of fund decisions, including investment decisions, for the Healthcare Fund, ASI Capital, and the Income Fund.

54. Borkowski and Hawkins, at all relevant times, acted within the scope of their employment at SkiHawk and TCG with regard to the violations outlined in this Complaint.

55. As investment advisers, Borkowski and Hawkins owed a fiduciary duty to the Healthcare Fund, ASI Capital, and the Income Fund.

D. ***Schiff Acted as an Investment Adviser to ASI Capital and the Income Fund Within the Meaning of Section 202(a)(11) of the Advisers Act.***

56. From January 1, 2019 to the present, Schiff was an investment adviser to ASI Capital and the Income Fund.

57.     Schiff, for compensation, engaged in the business of advising ASI Capital and the Income Fund as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

58.     Schiff received compensation for the period 2019 to the present for his advisory work through payments received from TCG.

59.     Schiff is an owner of and exercises control of TCG, including in his role as President and, formerly, as CFO. Schiff was also a member of the TCG's asset management committee and played a role in managing certain investments.

60.     Schiff, at all relevant times, acted within the scope of his employment at TCG with regard to the violations alleged in this Complaint.

61.     As an investment adviser, Schiff owed a fiduciary duty to ASI Capital and the Income Fund.

## II.   The Defendants Offered and Sold Investments in Securities for the Healthcare Fund, ASI Capital, and the Income Fund.

62.     Defendants offered and sold investments that are "securities" as defined in Section 2(a)(1) of the Securities Act, Section 3(a)(10) of the Exchange Act, and Section 202(a)(18) of the Advisers Act.

63.     Section 2(a)(1) of the Securities Act, Section 3(a)(10) of the Exchange Act, and Section 202(a)(18) of the Advisers Act define "security" to include, among other things, any "note," "bond," or "investment contract."

### A.   *Healthcare Fund Limited Partnership Interests are Securities.*

64.     SkiHawk, Borkowski, and Hawkins offered and sold at least $30 million in limited partnership investments to at least 80 investors in the Healthcare Fund from 2016 through at least 2020. These limited partnership interests generally entitled investors to a preferred return

of between 6% and 10% per year with the potential for additional equity gains depending upon the performance of the Healthcare Fund.

65.     Under the Securities Act, Exchange Act, and Advisers Act, the definition of security specifically includes investment contracts. The Healthcare Fund limited partnership interests are investment contracts and are securities.

66.     The investors in the Healthcare Fund invested money into the fund, a common enterprise, with the expectation of earning profits based upon the efforts of the Healthcare Fund's managers.

**B.   _ASI Capital Notes and LLC Membership Interests are Securities._**

67.     SkiHawk, Borkowski, and Hawkins offered and sold at least $9 million in ASI Capital notes to at least 60 investors from 2012 to 2015. In 2017, in connection with a settlement with the Colorado Division of Securities ("CDOS Settlement"), SkiHawk, Borkowski, and Hawkins offered to repurchase the previously sold notes in a rescission offer. The ASI Capital notes were generally for five or ten years, and investors were entitled to interest payments of between 7% and 10% on their note investment as well as a return of principal at the end of the note term.

68.     Under the Securities Act, Exchange Act, and Advisers Act, the definition of security specifically includes notes, and the ASI Capital notes are securities.

69.     The purpose of the ASI Capital notes was to raise money for investment purposes; the notes were offered to at least 60 investors that were not affiliated with the manager; a reasonable member of the investing public would consider them investments given that they were marketed as providing steady income as part of an overall investment portfolio; and there is

no factor that significantly reduces the risks of the investment because no other federal regulatory scheme exists to protect the ASI Capital noteholders.

70.     SkiHawk, Borkowski, and Hawkins also offered and sold over $4 million in LLC membership interests to over 20 investors in 2019 through early 2020. These LLC membership interests generally entitled investors to a preferred return of 6% per year with potential for additional equity gains depending upon the performance of ASI Capital.

71.     Under the Securities Act, Exchange Act, and Advisers Act, the definition of security specifically includes investment contracts. The ASI Capital LLC membership interests are investment contracts and are securities.

72.     The investors invested money in the fund, a common enterprise, with the expectation of earning profits based upon the efforts of the fund's managers.

### C. *Income Fund Bonds are Securities.*

73.     SkiHawk, Borkowski, and Hawkins offered and sold bonds in the Income Fund from 2015 to 2018, and SkiHawk, TCG, Borkowski, Hawkins, and Schiff sold bonds in the Income Fund from 2019 to 2020 and raised at least $32 million from at least 100 investors. The bonds were generally for nine or ten years, and investors were entitled to interest payments of between 7% and 9% on their bond investment as well as ultimately a return of principal.

74.     Under the Securities Act, Exchange Act, and Advisers Act, the definition of security specifically includes bonds, and the Income Fund bonds are securities.

### III. The Healthcare Fund, ASI Capital, and the Income Fund Were Each A Pooled Investment Vehicle as Defined in Rule 206(4)-8(b) of the Advisers Act.

### A. *The Healthcare Fund*

75.     The Healthcare Fund is a pooled investment vehicle because it pooled funds from numerous investors raised through its offering of limited partnership interests, and it was

primarily involved in the business of investing in securities, primarily through equity investments in various portfolio companies. The PPM describes it as "an investment fund designed to make strategic investments in small to mid-size healthcare providers through an established pipeline of experienced managers and sponsors."

### B.  *ASI Capital*

76.     ASI Capital is a pooled investment vehicle because it pooled funds from numerous investors raised through its offering of notes and LLC membership interests, and it was primarily involved in the business of investing in securities including having numerous equity and/or member interest in various portfolio companies. According to ASI Capital's PPM, ASI Capital's "principal business is using Note holder capital to make investments. These investments will produce the necessary cash flow to service Note holder interest and profit for the Company. Key to achieving these results is the optimal structure for the investment. The Company uses debt instruments with equity warrants as well as collateralized loans and strategic equity investments. At the core of our investment strategy is a unique hybrid debt and equity platform that generates predictable cash yields used to service the Note holders while participating in the value created by the company capital."

### C.  *The Income Fund*

77.     The Income Fund is a pooled investment vehicle because it pooled funds from numerous investors raised through its offering of bonds, and it was primarily involved in the business of investing in securities, including having numerous equity and/or member interest in various portfolio companies. The PPM describes the Income Fund as "an early development stage growth company that proposes to invest in income producing assets with companies and managers that have proven track records."

IV. **Defendants Violated The Federal Securities Laws.**

   A. ***Healthcare Fund Conflicts of Interest.***

     78.    SkiHawk, Borkowski, and Hawkins caused (1) the Healthcare Fund to invest in companies that Borkowski and Hawkins controlled and had an interest in, (2) the Healthcare Fund to pay a company that Borkowski and Hawkins directly or indirectly partially owned to provide services to the fund, and (3) the companies in which the Healthcare Fund invested to enter into agreements with entities directly or indirectly owned and managed by Borkowski and Hawkins.

     79.    SkiHawk, Borkowski, and Hawkins engaged in these conflicted transactions without obtaining the fund's consent or informing the fund's investors of the specific conflicts. In addition, SkiHawk, Borkowski, and Hawkins made false and misleading statements in Healthcare Fund PPMs about the conflicts and about the Healthcare Fund's Advisory Board's review of potential conflicts of interest.

     80.    SkiHawk, Borkowski, and Hawkins violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, Sections 206(1), 206(2), and 206(4) of the Advisers Act, and Rule 204(4)-8 thereunder in connection with the Healthcare Fund's conflicted transactions. In the alternative, Borkowski and Hawkins aided and abetted SkiHawk's violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

    i.    Borkowski and Hawkins Had Material Conflicts of Interest.

     81.    Borkowski and Hawkins had material undisclosed conflicts of interest with the Healthcare Fund.

     82.    Borkowski and Hawkins, as agents of SkiHawk and of the Healthcare Fund's General Partner, caused the Healthcare Fund to enter into conflicted transactions. Borkowski and

Hawkins were acting within the scope of their employment in taking the actions detailed below. Borkowski's and Hawkins' conflicts are imputed to SkiHawk.

        *a.*   *SkiHawk, Borkowski, and Hawkins caused the Healthcare Fund to Invest in Three Entities in Which They Had a Financial Interest.*

83.     SkiHawk, Borkowski, and Hawkins caused the Healthcare Fund to invest approximately 90% of its assets in three portfolio companies: LC Medical Assets, LLP ("LCMA"), Rock Medical Assets, LLC ("Rock Medical"), and East El Paso Medical Assets, LLC ("East El Paso"). Borkowski and Hawkins were owners of the general partners and/or managers of LCMA, Rock Medical, and East El Paso and were entitled to compensation as owners of the entities, as well as through management and other agreements with those entities.

84.     LCMA was formed to fund the development and construction of a hospital in Las Cruces, Mexico. At the time of the Healthcare Fund's investment in LCMA, Borkowski and Hawkins had a significant ownership interest in the general partner, LC Medical Assets GP, LLC ("LCMA GP") through their ownership interests in BUPP Holdings LLC ("BUPP"). LCMA GP has full control of the overall management, conduct, and operation of the partnership. LCMA GP is entitled to a certain percentage of profits from the partnership, which depends upon the performance of LCMA.

85.     Rock Medical was formed to develop and then help operate Rock Regional Hospital located in Derby, Kansas and to acquire an existing ambulatory surgery center. Rock Medical is managed by Rock Medical Assets GM, LLC ("Rock Medical General Manager"), which has full control of the overall management, conduct, and operation of Rock Medical. At the time of the Healthcare Fund's investment in Rock Medical, Borkowski and Hawkins had an ownership interest in the Rock Medical General Manager through their ownership interests in BUPP. Hawkins, Borkowski, and Schiff were the directors of the Rock Medical General

Manager. Rock Medical General Manager is entitled to a percentage of profits from the performance of Rock Medical. Borkowski's and Hawkins' equity interest in the Rock Medical General Manager was valued at over $8 million in a valuation report prepared by an outside valuation firm in March 2020.

86.     East El Paso is an operations and management group of a hospital located in El Paso, Texas. At the time of the Healthcare Fund's investment in East El Paso, East El Paso was led by an entity owned by Borkowski and Hawkins. Borkowski and Hawkins play a significant role in managing East El Paso, and are entitled to a percentage of profits from East El Paso.

87.     SkiHawk, Borkowski, and Hawkins had a material conflict of interest with the Healthcare Fund because they had an incentive to invest the assets of the Healthcare Fund in companies directly or indirectly owned and managed by Borkowski and Hawkins instead of other companies because investing in those companies generated additional compensation for Borkowski and Hawkins. SkiHawk, Borkowski, and Hawkins, knew or were reckless in not knowing, and should have known, that these conflicts of interest were material.

       b.   *SkiHawk, Borkowski, and Hawkins Caused the Healthcare Fund to Use An Entity They Partially Owned for Administrative Services.*

88.     Borkowski and Hawkins, through SkiHawk as the manager of the Healthcare Fund, engaged ASI Capital (which was 50% owned by Borkowski and Hawkins) to provide administrative services for the Healthcare Fund from 2016 to 2018 for which ASI Capital was paid $30,000, $60,000, and $100,000 in 2016, 2017, and 2018, respectively.

89.     Borkowski and Hawkins had a material conflict of interest with the Healthcare Fund because they had an incentive to cause the Healthcare Fund to engage ASI Capital to provide administrative services, which resulted in additional compensation for Borkowski and

Hawkins, as opposed to any other company. SkiHawk, Borkowski, and Hawkins knew or were reckless in not knowing, and should have known, that these conflicts of interest were material.

      *c.*   <u>*SkiHawk, Borkowski, and Hawkins Caused Companies in Which the Healthcare Fund Invested to Pay Fees to Entities They Controlled.*</u>

90.     Borkowski and Hawkins, while acting as the general partners for the portfolio companies in which the Healthcare Fund invested, caused the portfolio companies to enter into various agreements with other entities Borkowski and Hawkins owned and controlled, whereby the portfolio companies paid or agreed to pay millions of dollars in current and future earnings from 2016 to the present.

91.     Healthcare Fund portfolio companies LCMA, Rock Medical, and East El Paso, each entered into management and other agreements with entities in which Borkowski and Hawkins had a beneficial ownership interest and/or controlled. This allowed Borkowski and Hawkins to earn fees twice on the same assets, first for serving as the investment adviser to the Healthcare Fund and again for managing the companies in which they caused the Healthcare Fund to invest.

92.     LCMA was obligated to pay LCMA GP $250,000 during the construction period of the hospital, which increased to $500,000 for the first year of operation of the hospital, and then to $750,000 for years two through ten of operations. In addition, LCMA was obligated to pay LCMA GP a deferred sponsorship fee of $1.6 million, which was to be paid during the hospital construction phrase and the first year of operations of the hospital. Finally, LCMA GP was entitled to a financing fee of $750,000 pursuant to a financing agreement signed in 2015 relating to financing and developing the project. As alleged above, Borkowski and Hawkins had an ownership interest in LCMA GP.

93.     Rock Medical was obligated to pay the Rock Medical General Manager $250,000 during the construction period of the hospital, which increased to $500,000 for the first year of operation of the hospital, and then to $750,000 for years two through ten of operations. In addition, Rock Medical General Manager was entitled to a development fee of $2.5 million, with approximately $750,000 being paid to an entity owned by Borkowski and Hawkins. As alleged above, Borkowski and Hawkins had an ownership interest in Rock Medical General Manager.

94.     The general partner of East El Paso is entitled to $750,000 in compensation in connection with the original purchase of the asset, $400,000 per year for an annual oversight fee, and $2.5 million as a disposition fee when the East El Paso is eventually sold. As alleged above, Borkowski and Hawkins had an ownership interest in the general partner of East El Paso.

95.     Beyond agreements between the portfolio companies and the general partners/managers, LCMA and Rock Medical each engaged ASI Capital and then TCG to provide certain accounting services starting in at least 2018, resulting in hundreds of thousands of dollars in additional payments to affiliated entities of Borkowski and Hawkins by LCMA and Rock Medical.

96.     SkiHawk, Borkowski, and Hawkins had a material conflict of interest with the Healthcare Fund because they had an incentive to invest the assets of the Healthcare Fund in companies with management, services, financing, sponsorship, and accounting agreements with Borkowski's and Hawkins' affiliated companies, which allowed Borkowski and Hawkins to gain additional compensation for themselves, as opposed to other companies. SkiHawk, Borkowski, and Hawkins knew or were reckless in not knowing, and should have known, that these conflicts of interest were material.

ii. <u>SkiHawk, Borkowski, and Hawkins Violated Advisers Act Sections 206(1) and 206(2) by Failing to Adequately Disclose Their Conflicts of Interests.</u>

97.    SkiHawk, Borkowski, and Hawkins engaged in conflicted transactions with the Healthcare Fund and its portfolio companies without disclosing the specific conflicts or obtaining the fund's consent.

98.    Investment advisers are fiduciaries to their advisory clients. As such, SkiHawk, Borkowski, and Hawkins owe the Healthcare Fund an affirmative duty of utmost good faith, are obligated to provide full and fair disclosure of all material facts, have an affirmative obligation to employ reasonable care to avoid misleading their clients, and have a duty to act in their clients' best interests.

99.    As fiduciaries, SkiHawk, Borkowski, and Hawkins were required to disclose any conflict of interest that might incline them, consciously or unconsciously, to render advice which was not disinterested. SkiHawk, Borkowski, and Hawkins were required to provide their advisory clients with sufficient facts so that their clients could understand the conflicts of interests that they had and the business practices that they engaged in, and give informed consent to such conflicts or practices or reject them. When investment advisers have a conflict of interest, they must disclose the full extent of the investment adviser's interests in the transaction creating the conflict.

100.    As detailed above, Borkowski and Hawkins had conflicts of interest with their client, the Healthcare Fund, in three areas:  a) they were substantial owners of the general partner of three portfolio companies in which the Healthcare Fund invested (representing 90% of assets), b) the Healthcare Fund used affiliated service providers ASI Capital and TCG, and c) the portfolio companies in which the Healthcare Fund invested had agreements with the general

partners and managers of the portfolio companies (owned in part by Borkowski and Hawkins) worth millions of dollars and contracts with ASI Capital and TCG.

101.    By engaging in conflicted transactions with the Healthcare Fund and portfolio companies in which it invested without making the appropriate disclosures or obtaining consent, SkiHawk, Borkowski, and Hawkins breached their fiduciary duty to the Healthcare Fund.

102.    The Healthcare Fund's PPM disclosed that "Members of the General Partner have, and anticipate to have a material interest in two or more [investments] that the Fund holds and/or may invest in or acquire." This did not disclose the specific conflicts of interest to the Healthcare Fund or its investors because it failed to disclose the material, additional conflicts of interest outlined above.

103.    In addition, the Healthcare Fund PPMs from 2016 to 2019, and the financial statements for the year that ended December 31, 2018, falsely described the mechanism by which the fund would purportedly manage conflicts of interest, including related party transactions.

104.    The Healthcare Fund PPMs described an "Advisory Board" that would review related party transactions and determine if there was a conflict. Per the PPMs, the general partner would provide the Advisory Board with all material information and, per the PPMs and 2018 financial statements, the Advisory Board would consider all relevant factors, "including whether the related party transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances and the extent of the related party's interest in the transaction."

105.    Despite approving PPMs representing that the Advisory Board would review conflicts, SkiHawk, Borkowski, and Hawkins did not provide information to allow the Advisory

Board to review conflicts of interest. Neither the Advisory Board nor the Healthcare Fund investors approved the conflicted transactions. In addition, the Advisory Board had completely stopped functioning in 2019 despite representations to the contrary in the 2019 Healthcare Fund PPM.

106.    The Healthcare Fund's general partner, due to being owned in part and controlled by Borkowski and Hawkins, also had a conflict of interest with the Healthcare Fund, and therefore could not consent to the conflicted transactions.

107.    SkiHawk, Borkowski, and Hawkins knew, or were reckless in not knowing, and should have known, that they were advising on conflicted transactions because Borkowski and Hawkins were involved on both sides of the conflicted transactions.

108.    Borkowski and Hawkins approved the Healthcare Fund PPMs that did not disclose the specific conflicts of interest applicable to SkiHawk, Borkowski, and Hawkins and provided misleading information about the role of the Advisory Board after they knew or were reckless in not knowing, and should have known, that the Healthcare Fund and its portfolio companies were entering into conflicted transactions, that the Advisory Board was not being utilized as described, and after the Advisory Board no longer existed.

109.    SkiHawk, Borkowski, and Hawkins were negligent because a reasonable investment adviser would not have engaged in conflicted transactions in the Healthcare Fund without fund approval, following the conflicts procedures, or informing fund investors.

110.    Because Borkowski and Hawkins own and control SkiHawk, their scienter and negligence can be imputed to SkiHawk.

111.    Borkowski and Hawkins knew, or were reckless in not knowing, of SkiHawk's breach of its fiduciary duty to the Healthcare Fund and violations of Sections 206(1) and 206(2)

of the Advisers Act. Borkowski and Hawkins substantially assisted SkiHawk's breach of its fiduciary duty to the Healthcare Fund and violations of Sections 206(1) and 206(2) of the Advisers Act.

      iii.   <u>SkiHawk, Borkowski, and Hawkins Violated Exchange Act Section 10(b) and Rule 10b-5(b), Securities Act Section 17(a)(2), and Advisers Act Section 206(4) and Rule 206(4)-8 by Making False and Misleading Statements About the Conflicts of Interest.</u>

112.    SkiHawk, Borkowski, and Hawkins made false and misleading statements about the conflicts of interest.

113.    The Healthcare Fund's PPM represented that "Members of the General Partner have, and anticipate to have a material interest in two or more [investments] that the Fund holds and/or may invest in or acquire." This statement was false and misleading because it omitted to state facts about substantial conflicts necessary to make the statement not misleading. At least, the following material facts were omitted:

      a.    that Borkowski and Hawkins were substantial owners in and managers of the general partners of three of the portfolio companies in which the Healthcare Fund invested was not disclosed prior to the 2019 PPM;

      b.    that the Healthcare Fund used affiliated service providers ASI Capital and TCG, which provided additional compensation to Borkowski and Hawkins;

      c.    that the general partners and/or managers of three of the portfolio companies in which the Healthcare Fund invested had separate asset management, oversight, financing, development, and/or disposition agreements with the portfolio companies; and

      d.    that the three portfolio companies engaged ASI Capital and TCG for certain accounting services.

114.    Additionally, the PPMs stated that the "Fund will require each member of the General Partner to disclose information regarding ownership or other material interests such

member may have with regard to any potential Operating Entity prior to the Fund's investment in such Operating Entity."

115.    Both the PPMs and the 2018 financial statements explained these procedures were intended to help ensure that "the related party transaction does not result in a greater financial benefit to the related party simply due to the Fund's investment (when compared to a third party investment)."

116.    In addition, statements regarding how conflicts of interest would be handled and that an Advisory Board would review conflicted transactions were false and misleading. In fact, the Advisory Board never reviewed or considered conflicted transactions.

117.    The Healthcare Fund's 2019 PPM provided to prospective investors also continued to represent that there was an Advisory Board and included pictures of each of the former Advisory Board members with detailed biographical descriptions. By 2019, however, the Advisory Board had stopped functioning. The Advisory Board members' terms had expired and they had done no significant work since 2018.

118.    SkiHawk, Borkowski, and Hawkins made the false and misleading statements detailed above (1) about the limited conflicts of interest, (2) that the Advisory Board reviewed conflicted transactions, and (3) after 2019, that the Advisory Board existed.

119.    SkiHawk, Borkowski, and Hawkins were responsible for the Healthcare Fund PPMs and the financial statements. They were also responsible for the failure to adhere to the conflict procedures set forth in the PPMs.

120.    Borkowski and Hawkins each reviewed and approved final versions of the PPMs before they were provided to investors. Borkowski and Hawkins also reviewed and specifically

approved the sections of Healthcare Fund PPMs relating to conflicts of interest and understood they had a responsibility to disclose potential conflicts of interest.

121.    Borkowski and Hawkins each reviewed and approved financial statements for the Healthcare Fund.

122.    Borkowski and Hawkins were the maker of the statements because they approved and had ultimate authority over the Healthcare Fund PPMs and financial statements.

123.    SkiHawk was the maker of the statements because it was the adviser to the Fund and responsible for the statements.

124.    SkiHawk, Borkowski, and Hawkins obtained money or property by means of their false statements because the management fees paid to SkiHawk were based upon the amount of total assets invested and Hawkins and Borkowski obtained undisclosed services fees.

125.    Borkowski and Hawkins knew, or were reckless in not knowing, of SkiHawk's false statements about their conflicts and the Advisory Board to investors and prospective investors in the Healthcare Fund. Borkowski and Hawkins substantially assisted SkiHawk's false statements about their conflicts and the Advisory Board to investors and prospective investors in the Healthcare Fund and SkiHawk's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

126.    SkiHawk, Borkowski, and Hawkins knew or were reckless in not knowing, and should have known, that their statements concerning the Advisory Board were false and misleading because they knew (1) the extent of Borkowski's and Hawkins' conflicts of interest with the Healthcare Fund, (2) that the Advisory Board did not review conflicted transactions, and (3) that the Advisory Board did not exist after 2019. SkiHawk, Borkowski, and Hawkins were also negligent in making false and misleading statements concerning the Advisory Board.

127.    The statements were material to investors because a reasonable investor would consider conflicts of interest important and consider it important that the represented steps for reviewing conflicts of interest did not occur.

iv.    <u>SkiHawk, Borkowski, and Hawkins Violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (a)(3).</u>

128.    SkiHawk, Borkowski, and Hawkins engaged in deceptive acts, including disseminating the false and misleading Healthcare Fund PPMs and financial statements that each of them reviewed and approved to investors and prospective investors.

129.    SkiHawk, Borkowski, and Hawkins knew or were reckless in not knowing, and should have known, that their conduct was deceptive because they knew they were (1) making the false and misleading statements detailed above about their conflicts and the Advisory Board, (2) having the Healthcare Fund enter into undisclosed conflicted transactions, (3) entering into undisclosed transactions with the Healthcare Fund portfolio companies for services that financially benefitted themselves, and (4) reviewing and approving PPMs and financial statements with false and misleading statements about their conflicts and the Advisory Board. SkiHawk, Borkowski, and Hawkins were also negligent in engaging in this deceptive conduct because a reasonable investment adviser would have disclosed or avoided the conflicted transactions.

**B.    _False Representations that Income Fund Bonds were Secured by UCC-1 Financing Statements._**

130.    SkiHawk, TCG, Borkowski, and Hawkins each represented to current and prospective investors in the Income Fund that the Income Fund's bonds were secured by UCC-1 financing statements granting the bond holders a security interest in the Fund's investment portfolio, when, in fact, they were not.

131.    SkiHawk, from 2016 through at least 2018, violated Sections 17(a)(1) and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, Section 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder in connection with false representations that the Income Fund bonds were secured by UCC-1 financing statements.

132.    TCG, from 2019 through at least 2020, violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, Section 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder in connection with false representations that the Income Fund bonds were secured by UCC-1 financing statements.

133.    Borkowski and Hawkins violated Sections 17(a)(1) and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder in connection with false representations that Income Fund bonds were secured by UCC-1 financing statements. Borkowski and Hawkins also violated Section 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder in connection with those false representations. In the alternative, Borkowski and Hawkins aided and abetted SkiHawk's and TCG's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

    i.    <u>The Income Fund PPMs, Financial Statements, and Bonds Made False Statements about UCC-1 Filings.</u>

134.    SkiHawk, TCG, Borkowski, and Hawkins each repeatedly represented to investors and prospective investors in the Income Fund that the bonds issued and sold by the Income Fund would be secured by UCC-1 financing statements.

135.    The PPMs stated that "these bonds are secured by a UCC-1 Financing Statement granting the bond holders a security interest in the Fund's investment portfolio."

136.    The annual Income Fund financial statements stated that "[t]hese bonds are secured by a UCC-1 Financing Statement granting the bond holders a security interest in the Fund's investment portfolio."

137.    The bonds issued by the Income Fund stated that "[t]he Bond(s) offered by the maker will be considered senior debt of the Company, and as such will be collateralized in the event of default by the assets of the Company on a prorated basis."

138.    From 2016 through 2020, no UCC-1 filings had ever been made for the Income Fund bonds and the bonds were not otherwise collateralized or secured.

139.    SkiHawk, Borkowski, and Hawkins were responsible for the misleading Income Fund PPMs, financial statements, and bonds through the end of 2018. TCG, Borkowski, and Hawkins were responsible for the misleading Income Fund PPMs, financial statements, and bonds from January 1, 2019 to the present.

140.    Borkowski and Hawkins, and SkiHawk and TCG through Borkowski and Hawkins, each reviewed and approved and had ultimate authority over, the Income Fund PPMs, financial statements, and bonds before they were provided to investors.

141.    Borkowski and Hawkins were acting within the scope of their employment at SkiHawk and TCG when reviewing and approving the Income Fund PPMs, financial statements, and bonds before they were provided to investors.

ii.    <u>SkiHawk, TCG, Borkowski, and Hawkins Violated Exchange Act Section 10(b) and Rule 10b-5(b) and Advisers Act Section 206(4) and Rule 206(4)-8 of the Advisers Act and TCG violated Section 17(a)(2) of the Securities Act.</u>

142.    SkiHawk, TCG, Borkowski, and Hawkins made the false statements about the security for Income Fund bonds and UCC-1 filings detailed above.

143.    Each of the above statements about the security for Income Fund bonds and UCC-1 filings in the Income Fund PPMs, financial statements, and bonds themselves was false when made because the bonds were not secured and no UCC-1 filings were made for them.

144.    SkiHawk, TCG, Borkowski, and Hawkins knew or were reckless in not knowing, and should have known, that their statements in the Income Fund PPMs, financial statements, and bonds concerning the security for Income Fund bonds and UCC-1 filings were false and misleading because they knew, or were reckless in not knowing, that they had taken no steps to make UCC-1 filings for the Income Fund bonds. SkiHawk, TCG, Borkowski, and Hawkins were also negligent in making false and misleading statements concerning the security for Income Fund bonds and UCC-1 filings because a reasonable investment adviser would have secured the bonds before making statements that the bonds were secured.

145.    Because Borkowski and Hawkins own and control SkiHawk and TCG, and they were acting within the scope of their employment, their knowledge and scienter can be imputed to SkiHawk and TCG.

146.    The statements were material to investors because secured bonds are a safer investment than unsecured bonds and a reasonable investor would consider the security of an investment an important factor in making an investment decision.

147.    Borkowski and Hawkins were each a maker of the statements because they approved and had ultimate authority over the offering documents for the Income Fund.

148.    SkiHawk and TCG were each a maker of the statements because they were the advisers to the Fund and responsible for the statements.

149.    TCG obtained money or property by means of the misrepresentations because management fees paid to TCG were based upon the amount of total assets invested in ASI Capital, which included all of the assets of the Income Fund.

150.    In the alternative, Borkowski and Hawkins aided and abetted SkiHawk's and TCG's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. Borkowski and Hawkins knew, or were reckless in not knowing, of the false statements in the Income Fund PPMs, financial statements, and bonds concerning the security for Income Fund bonds and UCC-1 filings made by SkiHawk and TCG to investors and prospective investors in the Income Fund. Borkowski and Hawkins substantially assisted the making of the false statements in the Income Fund PPMs, financial statements, and bonds concerning the security for Income Fund bonds and UCC-1 filings made by SkiHawk and TCG to investors and prospective investors in the Income Fund and violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

iii.    <u>SkiHawk, TCG, Borkowski, and Hawkins Violated Exchange Act Section 10(b) and Rules 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (a)(3).</u>

151.    SkiHawk, TCG, Borkowski, and Hawkins engaged in deceptive acts, including disseminating the misleading PPMs and financial statements that each of them created and approved to investors and prospective investors.

152.    SkiHawk, TCG, Borkowski, and Hawkins knew or were reckless in not knowing, and should have known, that they were engaging in deceptive acts because they (1) approved PPMs and financial statements, which included the false statements about the security of the bonds and UCC-1 filings detailed above, (2) repeatedly provided those materials to investors and prospective investors in the Income Fund, and (3) did not make the UCC-1 filings despite representations to the contrary.

153.     SkiHawk, TCG, Borkowski, and Hawkins were also negligent because a reasonable investment adviser would have ensured, or taken steps to ensure, the UCC-1 filings were properly made and that representations about UCC-1 filings in the Income Fund PPMs, financial statements, and bond documents were accurate.

### C. *Overvalued AFT Investment in the 2014 and 2015 ASI Capital Financial Statements.*

154.     ASI Capital held a $3.2 million investment in notes from AFT. Despite knowing certain facts indicating that the value of that investment had substantially declined, SkiHawk, Borkowski, Hawkins, and Schiff did not reduce the value of the AFT investment in ASI Capital's financial statements as of December 31, 2014, and only reduced it by 33% as of December 31, 2015. They then provided unaudited and audited financial statements that included the overvalued AFT investment to investors and prospective investors in ASI Capital. Borkowski and Hawkins were each aware of the importance of this asset to ASI Capital, and misled investors in 2015 in order to raise additional funds.

155.     SkiHawk, Borkowski, and Hawkins violated Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, Section 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder in connection with the overvalued AFT investment in the 2014 and 2015 ASI Capital financial statements. In the alternative, Borkowski and Hawkins aided and abetted SkiHawk's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

156.     Schiff violated Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) thereunder, in connection with the overvalued investment in AFT notes in the 2014 and 2015 ASI Capital financial statements. In addition, Schiff aided and abetted SkiHawk's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act and Section 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder.

i.   The AFT Investment

157.    The AFT investment was the purchase of notes from a single Colorado Springs based appliance store ("AFT").

158.    AFT had stopped making payments on the notes in October 2013, and by December 31, 2014, the notes were in default, AFT had conveyed the underlying collateral for the notes to a third party, and AFT's owner and manager had used AFT money to fund other businesses and to purchase $200,000 in land for his personal home.

159.    By December 31, 2014, ASI Capital owned approximately $3.2 million of notes for the AFT investment, which was included at full value on ASI Capital's consolidated statement of assets and liabilities, making up 18% of ASI Capital's total assets.

160.    By the end of 2015, AFT had not made any payments on the notes since October 2013 or provided proof of any additional collateral. In addition, ASI Capital sued AFT in April 2015 for fraud, breach of contract, and civil theft based on AFT's non-payment of the notes.

161.    In the December 31, 2015 audited financial statements, ASI Capital wrote down the fair value of the AFT investment by approximately 33% to $2,137,521.

162.    SkiHawk, Borkowski, and Hawkins managed ASI Capital, and were responsible for the financial information provided to ASI Capital investors, which included the valuations of investments made by ASI Capital and the impact those valuations had on the total assets and profitability of ASI Capital. Investors used the financial information to help evaluate whether to purchase notes from ASI Capital.

163.    SkiHawk, Borkowski, Hawkins, and Schiff were responsible for valuation of the AFT investment, and inflated the value of the AFT investment in the year-end 2014 unaudited financial statements, which were provided to investors and prospective investors in early 2015.

They also inflated the value of the AFT investment in the year-end 2014 and 2015 audited financial statements, which were provided to investors in 2016 prior to the rescission offering in 2017.

ii. <u>SkiHawk, Borkowski, and Hawkins Violated Exchange Act Section 10(b) and Rule 10b-5(b) and Advisers Act Section 206(4) and Rule 206(4)-8 and Schiff Aided and Abetted SkiHawk's Violation.</u>

164.    The ASI Capital 2014 and 2015 audited financial statements specifically state that they were prepared in accordance with generally accepted accounting principles ("GAAP"). In an email, Borkowski told the investment adviser acting on behalf of the vast majority of ASI Capital investors that the 2014 unaudited financial statements were prepared in accordance with GAAP.

165.    The statements that the ASI Capital 2014 unaudited financial statements and the ASI Capital 2014 and 2015 audited financial statements were prepared in accordance with GAAP were false when made because the AFT Investment was not valued in accordance with GAAP.

166.    Several facts indicated that the expected future cash flows from the AFT investment were significantly impaired. These included that: (1) AFT had stopped making payments on the notes in October 2013, (2) by December 31, 2014, the notes were in default, (3) AFT had conveyed the underlying collateral for the notes to a third party, and (4) ASI Capital had sued AFT in April 2015 for fraud, breach of contract, and civil theft based on AFT's non-payment of the notes.

167.    The AFT investment was not valued in accordance with GAAP because, despite the expected future cash flows from this investment being significantly impaired by the default and conveyance of the underlying collateral, the recorded fair value of this investment was not reduced in the December 31, 2014 ASI Capital unaudited and audited financial statements.

Under FASB Accounting Standard Codification 820 *Fair Value Measurement* ("ASC 820"), a significant reduction in the value of the AFT investment should have been made. Instead, it was recorded at full original value.

168.    In addition, the AFT investment was not valued in accordance with GAAP because under ASC 820, a significant additional material reduction in the value of the AFT investment on the December 31, 2015 ASI Capital financial statements should have been made. Instead, it was only reduced by approximately 33%.

169.    SkiHawk, Borkowski, Hawkins, and Schiff were responsible for the ASI Capital 2014 and 2015 financial statements. As CFO, Schiff prepared the financial statements and had responsibility for ensuring the financial statements conformed with GAAP as represented. Borkowski and Hawkins supervised the preparation of the financial statements and had ultimate authority over the financial statements as the managers of SkiHawk and ASI Capital.

170.    The ASI Capital unaudited financial statements for year ended December 31, 2014 were provided to investors in connection with the offers, purchases, and sales of ASI Capital notes, described above.

171.    The ASI Capital audited financial statements for years ended December 31, 2014 and December 31, 2015 were provided to investors and prospective investors prior to the investors making their investment decision concerning the rescission offer by ASI Capital made in 2017 in connection with the CDOS settlement, described above.

172.    SkiHawk, Borkowski, Hawkins, and Schiff knew or were reckless in not knowing, and should have known, that the statements that the ASI Capital 2014 and 2015 audited financial statements were prepared in accordance with GAAP were false because SkiHawk, Borkowski, Hawkins, and Schiff also knew that (1) AFT had stopped making

payments on the notes in October 2013, (2) by December 31, 2014 the notes were in default, and (3) AFT had conveyed the underlying collateral for the notes to a third party, and, as of December 31, 2015, SkiHawk, Borkowski, Hawkins, and Schiff also knew that (4) AFT had not made any further payments on the notes, (5) AFT had not provided any additional collateral, and (6) ASI Capital had sued AFT for fraud and non-payment of the notes.

173.    Borkowski and Hawkins also instructed the audit firm engaged to audit the December 31, 2014 and December 31, 2015 financial statements to exclude the AFT investment from its audit, which the audit firm noted on its report.

174.    SkiHawk, Borkowski, Hawkins, and Schiff were also negligent in making or approving statements that ASI Capital 2014 unaudited financial statements and the ASI Capital 2014 and 2015 audited financial statements were prepared in accordance with GAAP.

175.    SkiHawk, Borkowski, and Hawkins were negligent because a reasonable investment adviser would not have ignored material negative facts in conducting valuations, overstated the value of assets, or misrepresented that the financial statements were prepared in accordance with GAAP.

176.    Schiff was negligent because a reasonable CFO and CPA would have performed sufficient investigation and analysis under ASC 820 to properly assess the extent of the reduction in fair value consistent with GAAP guidance. Schiff was also negligent because a reasonable CFO and CPA would not have ignored material negative facts known to him in conducting valuations and reviewing financial statements.

177.    Because Borkowski and Hawkins own and control SkiHawk, their scienter and negligence can be imputed to SkiHawk. As an agent, Schiff's negligence can also be attributed to SkiHawk.

178.     The statements that the ASI Capital 2014 unaudited financial statements and the ASI Capital 2014 and 2015 audited financial statements were prepared in accordance with GAAP were material because a reasonable investor would consider it important that ASI Capital's claimed income in one or more of the financial statements should have been materially less, that the overall assets were materially overstated, that the specific value of the AFT investment was overstated, that the history of profitability of ASI Capital over two years was overstated, and that the financial statements were not prepared in accordance with GAAP as had been represented.

179.     Schiff, Borkowski and Hawkins, knew, or were reckless in not knowing, of SkiHawk's false statements that the ASI Capital 2014 unaudited financial statements and the ASI Capital 2014 and 2015 audited financial statements were prepared in accordance with GAAP and Schiff, Borkowski, and Hawkins substantially assisted SkiHawk's false statements that the ASI Capital 2014 unaudited financial statements and the ASI Capital 2014 and 2015 audited financial statements were prepared in accordance with GAAP.

iii.     <u>SkiHawk, Borkowski, Hawkins, and Schiff Violated Securities Act Section 10(b) and Rule 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (3).</u>

180.     SkiHawk, Borkowski, Hawkins, and Schiff engaged in deceptive acts, including, for multiple years, approving and providing to investors and prospective investors financial statements that inflated the value of the AFT investment and represented that they were prepared in accordance with GAAP when they were not.

181.     SkiHawk, Borkowski, Hawkins, and Schiff knew or were reckless in not knowing, and should have known, that they were approving and providing to investors and prospective investors financial statements that inflated the value of the AFT investment and represented that they were prepared in accordance with GAAP when they were not because, as of

December 31, 2014, they knew that: (1) AFT had stopped making payments on the notes in

October 2013, (2) the notes were in default, (3) AFT had conveyed the underlying collateral for

the notes to a third party, (4) the manager and owner of AFT had used funds from AFT to fund

other businesses and to purchase a lot worth over $200,000 to build his personal home, and

(5) the AFT investment was worth significantly less than $3.2 million, and, as of December 31,

2015, they also knew that: (1) AFT had not made any further payments on the notes, (2) AFT

had not provided any additional collateral, and (3) ASI Capital had sued AFT for fraud and non-

payment of the notes.

182.    SkiHawk, Borkowski, Hawkins, and Schiff were also negligent in approving

financial statements that inflated the value of the AFT investment, approving financial

statements that represented that they were prepared in accordance with GAAP when they were

not, and providing such financial statements to investors and prospective investors.

### D. *TCG, Borkowski, and Schiff Materially Overvalued Thorin in the 2019 and 2020 Financial Statements and Bankruptcy Filings for the Income Fund and ASI Capital.*

183.    TCG, Borkowski, and Schiff violated Sections 206(2) and 206(4) of the Advisers

Act, and Rule 206(4)-8 thereunder in connection with the overvalued Thorin investment in

unaudited financial statements for ASI Capital and the Income Fund.

i.   The Thorin Investment

184.    In 2016, the Income Fund invested in Thorin. This asset appeared on the financial

statements of the Income Fund. It also appeared on the financial statements of ASI Capital,

because the Income Fund is wholly owned by ASI Capital.

185.    Thorin's primary asset is an ownership interest in Caldera Holdings, LLC

("Caldera"), which owns a gold mine in Colorado. The gold mine has not produced any minerals

in over 40 years.

186.    The Income Fund acquired its interests in Thorin when it loaned almost $4 million to Caldera. As a result of these transactions, as of year-end 2018, the Income Fund owned 37.1% of Thorin.

187.    During 2019, Caldera defaulted its loans to the Income Fund. The Income Fund, rather than forcing Caldera into bankruptcy, attempted to lead a reorganization of both Thorin and Caldera outside of bankruptcy. Had this reorganization been finalized, the Income Fund's ownership in Thorin would have increased from 37.1% to 63%, and Thorin's ownership percentage of Caldera would have increased from 73% to 90%.

188.    The reorganization was not completed with regard to either Thorin or Caldera.

189.    The agreement that governs ownership percentages of Thorin provides that:

> No provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and Members holding a majority interest; provided, however, that any amendment to this Agreement that could adversely and disproportionately affect some Members relative to any others shall also require the written consent of all such adversely affected Members.

190.    In order for the Income Fund's ownership percentage of Thorin to increase, other members' ownership percentages would decrease and, thus, some members were "adversely and disproportionately" affected and were required to consent to the revised ownership percentages in order for the Thorin reorganization to be effective.

191.    Not all adversely affected Members provided written consent to the revised ownership percentages, making the Thorin reorganization incomplete and ineffective under the terms of the operative agreement. Accordingly, the Thorin reorganization was not approved and the Income Fund's ownership remained at 37%.

192.     Thorin's 2019 tax returns, which TCG received, do not reflect that a reorganization occurred and instead maintained the Income Fund's ownership percentage at 37%.

193.     Thorin's ownership percentage of Caldera has also not increased. The co-owner of Caldera never agreed to a reorganization in which Thorin's ownership of Caldera would increase and there is no legal document allowing Thorin to unilaterally increase its ownership of Caldera.

194.     To value its equity investment in Thorin, the Income Fund used the income approach under ASC 820 by employing a discounted cash flow model.

195.     The valuation was initially prepared and provided by Thorin, and then TCG, Borkowski, and Schiff used it to determine a final value for ASI Capital's interest in Thorin for each financial period identified above. Borkowski took the lead on reviewing and modifying the valuation provided by Thorin and Schiff then reviewed the valuation in his role as CFO and as a member of the TCG asset management committee.

196.     Despite the reorganization not being completed with regard to either Thorin or Caldera, TCG, Borkowski, and Schiff prepared the final version of the Income Fund's discounted cash flow model for the Thorin investment as of December 31, 2019, June 14, 2020, and December 31, 2020 using the assumption that the full reorganization of both Thorin and Caldera had taken place.

197.     Auditors were not involved in the review or approval of these financial statements or other financial information.

a. <u>*The Thorin Investment was Overvalued in the 2019 and 2020 Financial Statements and Bankruptcy Filings for ASI Capital and the Income Fund.*</u>

198. TCG, Borkowski, and Schiff overstated the assets in the Income Fund's and ASI Capital's December 31, 2019 and 2020 financial statements and June 14, 2020 bankruptcy filing because TCG, Borkowski, and Schiff significantly inflated the Income Fund's ownership percentage of Thorin and Thorin's ownership percentage of Caldera.

199. The Income Fund's ownership percentage of Thorin was overstated by approximately 69%.

200. The year-end 2019 financial statements and June 14, 2020 bankruptcy filing valued the Income Fund's interest in Thorin at approximately $13.7 million. This was a 79% increase in value (an increase of approximately $6 million) from year end 2018, even though Caldera had completely defaulted on its debt to the Income Fund.

201. If the correct 37.1% ownership percentage of Thorin had been used and Thorin's correct ownership of Caldera of 73% had been used, the value of the Thorin investment in the December 2019 financial statements and June 2020 bankruptcy filing would drop by approximately 52%, to approximately $6.5 million, and the net income for the Income Fund for 2019, rather than being approximately $7 million, would have been a net loss of approximately $150,000. The Income Fund's net assets as of December 31, 2019, also would have declined from approximately $11.6 million to approximately $4.5 million.

202. TCG, Borkowski, and Schiff continued to use the inflated ownership percentage as the basis of the Thorin investment's valuation in the Income Fund's year-end 2020 financial statements. If the correct ownership percentages had been used, the value would have been approximately 48% lower and the amount of total investments in the Income Fund would have dropped by approximately 15%.

b.  *TCG, Borkowski, and Schiff Were Responsible for the Thorin Investment Valuations and the Income Fund's and ASI Capital's Financial Statements.*

203.    TCG, Borkowski, and Schiff were responsible for the Thorin investment valuations in the 2019 and 2020 Income Fund and ASI Capital financial statements and bankruptcy filings.

204.    TCG performed the valuation work as part of its duties in managing ASI Capital and the Income Fund. Borkowski was the person at TCG responsible for the Thorin investment. Schiff was the CFO at TCG during 2019 and 2020, and had significant responsibility, as a licensed CPA, in determining that the valuation of the Thorin investment was reasonable and consistent with GAAP.

c.  *TCG, Borkowski, and Schiff Acted Negligently in Valuing the Thorin Investment in the 2019 and 2020 ASI Capital and Income Fund Financial Statements.*

205.    Borkowski and Schiff were negligent because a reasonable investment adviser would have applied the correct ownership percentages in valuation models and not ignored material negative facts known to them in conducting valuations and claiming financial statements were prepared in accordance with GAAP. With regard to the reorganization of Thorin, a reasonable investment adviser would not have ignored the Thorin tax returns and the clear language in the operating agreement, all of which demonstrate that the Thorin reorganization did not occur. Similarly, with regard to the reorganization of Caldera, a reasonable investment adviser would not have assumed the Caldera reorganization could occur without a clear legal basis.

206.    Schiff was also negligent in that a reasonable CFO would have considered material negative facts known to him in conducting valuations and reviewing financial statements, would have conducted additional investigation to develop sufficient evidence

concerning key valuation facts, and would have considered and applied applicable GAAP provisions.

207.     The negligent acts of Borkowski and Schiff, performed in the scope of their employment by TCG, is imputed to TCG.

ii.   <u>TCG, Borkowski, and Schiff violated Adviser Act Section 206(2)</u>.

208.     Through the conduct alleged above, TCG, Borkowski, and Schiff breached their fiduciary duties to the Income Fund and ASI Capital by overvaluing the Thorin investment in unaudited financial statements for ASI Capital and the Income Fund.

209.     Overvaluing the Thorin investment in unaudited financial statements for ASI Capital and the Income Fund was a practice or course of business that operated as a fraud on ASI Capital and the Income Fund.

210.     A reasonable client would have found it important to know the valuations were overstated because, when properly valued, the Thorin investment was worth far less.

211.     Additionally, because ASI Capital paid TCG a management fee that was based on assets under management, TCG, Borkowski, and Schiff defrauded the fund by collecting excess management fees on the overvalued Thorin asset.

212.     The misrepresentations by TCG, Borkowski, and Schiff were material to ASI Capital and the Income Fund. As discussed above, the value of the Thorin investment was materially overstated in the 2019 and 2020 financial statements and bankruptcy filings, and using the correct ownership percentage would have resulted in material decreases in income, total assets, and the specific value of the Thorin investment in the financial statements and bankruptcy filings. Because ASI Capital paid TCG a management fee based on assets under management,

TCG (and Borkowski and Schiff) was able to defraud the Income Fund and ASI Capital by collecting excess management fees on the overvalued Thorin asset.

    iii.  <u>TCG, Borkowski, and Schiff violated Adviser Act Sections 206(4) and Rule 204(4)-8</u>

213.    Investors were provided the unaudited financial statements and other financial information for ASI Capital and the Income Fund, all of which contained the Thorin asset, for periods ending December 31, 2019 (provided in May 2020), June 14, 2020 (a Schedule of Real and Personal Property filed in the bankruptcy court in July 2020), and December 31, 2020 (provided in March 2021).

214.    The December 31, 2019 and 2020 financial statements represented that they prepared in accordance with GAAP.

215.    This, however, was false because TCG, Borkowski, and Schiff negligently used the incorrect ownership percentage to value the Thorin asset.

216.    The misrepresentations by TCG, Borkowski, and Schiff were material to investors. As discussed above, the value of the Thorin investment was materially overstated in the 2019 and 2020 financial statements and bankruptcy filings, and using the correct ownership percentage would have resulted in material decreases in income, total assets, and the specific value of the Thorin investment in the financial statements and bankruptcy filings. Investors were relying upon these financial statements and bankruptcy filings to make important decisions in 2020 and 2021 relating to forbearance agreements and the dismissal of the bankruptcies of ASI Capital and the Income Fund.

217.    As described above, TCG, Borkowski, and Schiff each acted as an investment adviser to ASI Capital and the Income Fund, both pooled investment vehicles, and acted

negligently in making false and misleading statements about the value of the Thorin investment and in claiming the financial statements were prepared in accordance with GAAP standards.

## FIRST CLAIM FOR RELIEF
### Fraud by an Investment Adviser: Section 206(1) of the Advisers Act
### (Against SkiHawk, Borkowski, and Hawkins)

218.    The SEC realleges and incorporates by reference paragraphs 1 through 217 as though fully set forth herein.

219.    As a result of the conduct alleged herein, Defendants SkiHawk, Borkowski, and Hawkins, while acting as investment advisers, by the use of the mails or means or instrumentality of interstate commerce, directly or indirectly with scienter, employed a device, scheme, or artifice to defraud a client or prospective client.

220.    By virtue of the foregoing, Defendants SkiHawk, Borkowski, and Hawkins, directly or indirectly, violated, and unless enjoined, will again violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## SECOND CLAIM FOR RELIEF
### Fraud by an Investment Adviser: Section 206(2) of the Advisers Act
### (Against All Defendants)

221.    The SEC realleges and incorporates by reference paragraphs 1 through 217 as though fully set forth herein.

222.    As a result of the conduct alleged herein, Defendants SkiHawk, TCG, Borkowski, Hawkins, and Schiff, while acting as investment advisers, by the use of the mails or means or instrumentality of interstate commerce, directly or indirectly engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a client or prospective client.

223.     By virtue of the foregoing, Defendants SkiHawk, TCG, Borkowski, Hawkins, and

Schiff, directly or indirectly, violated, and unless enjoined, will again violate Section 206(2) of

the Advisers Act [15 U.S.C. § 80b-6(2)].

### THIRD CLAIM FOR RELIEF
**Aiding and Abetting Fraud by an Investment Adviser**
**Sections 206(1) and 206(2) of the Advisers Act**
**(Against Borkowski and Hawkins in the alternative)**

224.     The SEC realleges and incorporates by reference paragraphs 1 through 217 as

though fully set forth herein

225.     SkiHawk engaged in violations of Sections 206(1) and 206(2) of the Advisers

Act.

226.     As a result of the conduct alleged herein, Defendants Borkowski, and Hawkins

aided and abetted Defendant SkiHawk's violations of Sections 206(1) and 206(2) of the Advisers

Act by knowingly or recklessly providing substantial assistance to SkiHawk, which, while acting

as an investment adviser, by the use of the mails or means or instrumentality of interstate

commerce, directly or indirectly: (a) employed a device, scheme, or artifice to defraud; or (b)

engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon

a client or prospective client, as more particularly described above.

227.     By virtue of the foregoing, Defendants Borkowski and Hawkins directly or

indirectly, aided and abetted and, unless enjoined, will again aid and abet violations of Sections

206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) & (2).

## FOURTH CLAIM FOR RELIEF

**Fraud on Investors in a Pooled Investment Vehicle: 206(4) of the Advisers Act
and Rule 206(4)-8 Thereunder
(Against All Defendants)**

228.     The SEC realleges and incorporates by reference paragraphs 1 through 217 as though fully set forth herein.

229.     At all times relevant to the Complaint, Defendants SkiHawk, TCG, Borkowski, Hawkins, and Schiff acted as investment advisers to the Healthcare Fund, ASI Capital and/or the Income Fund, which are pooled investment vehicles as defined in Rule 206(4)-8(b) [17 C.F.R. § 275/206(4)-8(b)]. Defendants SkiHawk, TCG, Borkowski, Hawkins, and Schiff, while acting as investment advisers to one or more pooled investment vehicles, by use of the mails or means or instrumentality of interstate commerce, directly or indirectly engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative. Defendants SkiHawk, TCG, Borkowski, Hawkins, and Schiff directly or indirectly: (a) made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in a pooled investment vehicle; and (b) otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

230.     By virtue of the foregoing, Defendants SkiHawk, TCG, Borkowski, Hawkins, and Schiff, directly or indirectly, violated, and unless enjoined, will again violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(2)] and Rule 206(4)-8 [17 C.F.R. § 275/206(4)-8] thereunder.

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Fraud on Investors in a Pooled Investment Vehicle: Section 206(4) of**
**the Advisers Act and Rule 206(4)-8 Thereunder**
**(Against Schiff, Borkowski, and Hawkins in the alternative)**

231.     The SEC realleges and incorporates by reference paragraphs 1 through 217 as

though fully set forth herein.

232.     As a result of the conduct alleged herein, Defendants Schiff, Borkowski, and

Hawkins aided and abetted Defendant SkiHawk's violations of Section 206(4) of the Advisers

Act and Rule 206(4)-8 thereunder by knowingly or recklessly providing substantial assistance to

SkiHawk who, while acting as an investment adviser to a pooled investment vehicle, by the use

of the mails or means or instrumentality of interstate commerce, directly or indirectly engaged in

acts, practices, or courses of business which were fraudulent, deceptive, or manipulative and

directly or indirectly: (a) made untrue statements of material fact and omitted to state material

facts necessary to make statements made, in the light of the circumstances under which they

were made, not misleading, to investors and prospective investors in a pooled investment

vehicle; and (b) otherwise engaged in acts, practices, or courses of business that were fraudulent,

deceptive, or manipulative with respect to investors or prospective investors in a pooled

investment vehicle.

233.     As a result of the conduct alleged herein, Defendants Borkowski and Hawkins

aided and abetted Defendant TCG's violations of Section 206(4) of the Advisers Act and Rule

206(4)-8 thereunder by knowingly or recklessly providing substantial assistance to TCG who,

while acting as an investment adviser to a pooled investment vehicle, by the use of the mails or

means or instrumentality of interstate commerce, directly or indirectly engaged in acts, practices,

or courses of business which were fraudulent, deceptive, or manipulative and directly or

indirectly: (a) made untrue statements of material fact and omitted to state material facts

necessary to make statements made, in the light of the circumstances under which they were

made, not misleading, to investors and prospective investors in a pooled investment vehicle; and

(b) otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive,

or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

234.    By virtue of the foregoing, Defendants Schiff, Borkowski, and Hawkins, directly

or indirectly, aided and abetted and, unless enjoined, will again aid and abet violations of Section

206(4) of the Advisers Act [15 U.S.C. § 80b-6(2)] and Rule 206(4)-8 [17 C.F.R. § 275/206(4)-8]

thereunder.

## SIXTH CLAIM FOR RELIEF
### Fraud (Misstatements and Omissions): Section 10(b) of the Exchange Act
### and Rule 10b-5(b)
### (Against SkiHawk, TCG, Borkowski, and Hawkins)

235.    The SEC realleges and incorporates by reference paragraphs 1 through 217 as

though fully set forth herein.

236.    Defendants SkiHawk, TCG, Borkowski, and Hawkins, directly or indirectly,

acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the

mails, or of a facility of a national securities exchange, in connection with the purchase or sale of

a security, made untrue statements of material fact or omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made,

not misleading.

237.    By virtue of the foregoing, Defendants SkiHawk, TCG, Borkowski, and Hawkins,

directly or indirectly, violated and, unless restrained and enjoined, will again violate Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5]

thereunder.

### SEVENTH CLAIM FOR RELIEF
**Aiding and Abetting Fraud (Misstatements and Omissions): Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Schiff)**

238.     The SEC realleges and incorporates by reference paragraphs 1 through 217 as though fully set forth herein.

239.     As a result of the conduct alleged herein, Defendant Schiff aided and abetted Defendant SkiHawk's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder by knowingly or recklessly providing substantial assistance to SkiHawk, who, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

240.     By virtue of the foregoing, Defendant Schiff, directly or indirectly, aided and abetted and, unless enjoined, will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

### EIGHTH CLAIM FOR RELIEF
**Fraud: Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**
**(Against All Defendants)**

241.     The SEC realleges and incorporates by reference paragraphs 1 through 217 as though fully set forth herein.

242.     Defendants SkiHawk, TCG, Borkowski, Hawkins, and Schiff, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: employed devices, schemes, or artifices to defraud; or engaged in acts,

practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

243.    By virtue of the foregoing, Defendants SkiHawk, TCG, Borkowski, Hawkins, and Schiff, directly or indirectly, each violated, and, unless restrained and enjoined, will again violate Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

## NINTH CLAIM FOR RELIEF
### Fraud: Sections 17(a)(1) and (3) of the Securities Act
### (Against All Defendants)

244.    The SEC realleges and incorporates by reference paragraphs 1 through 217 as though fully set forth herein.

245.    Defendants SkiHawk, TCG, Borkowski, Hawkins, and Schiff, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, employed a device, scheme, or artifice to defraud and engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon purchasers.

246.    By virtue of the foregoing, Defendants SkiHawk, TCG, Borkowski, Hawkins, and Schiff, directly or indirectly, violated and, unless restrained and enjoined, will again violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## TENTH CLAIM FOR RELIEF
### Fraud: Section 17(a)(2) of the Securities Act
### (Against SkiHawk, TCG, Borkowski, and Hawkins)

247.    The SEC realleges and incorporates by reference paragraphs 1 through 217 as though fully set forth herein.

248.    Defendants SkiHawk, TCG, Borkowski, and Hawkins, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

249.    By virtue of the foregoing, Defendants SkiHawk, TCG, Borkowski, and Hawkins, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## **RELIEF SOUGHT**

**WHEREFORE**, the SEC respectfully requests that this Court:

## **I.**

Find that the Defendants committed the violations alleged in this Complaint;

## **II.**

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, permanently restraining and enjoining the Defendants from violating, directly or indirectly, the laws and rules they are each alleged to have violated in this Complaint;

## **III.**

Order the Defendants to disgorge all ill-gotten gains, together with pre-judgment interest, derived from the activities set forth in this Complaint;

## **IV.**

Order Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## V.

Grant such other and further relief as this Court may deem just and proper.

### **<u>JURY DEMAND</u>**

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted, June 29, 2021

*s/ Polly Atkinson*
Polly A. Atkinson
Mark L. Williams
Attorneys for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
